**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
              ndeckant@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
Sarah N. Westcot (State Bar No. 264916)
2665 S. Bayshore Dr., Suite 220
Miami, FL 33133-5402
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail:  scott@bursor.com
              swestcot@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCIS PARGETT, on behalf of himself and all others similarly situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>WAL-MART STORES, INC.,<br><br>                              Defendant. | Case No.   5:19-cv-2157<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

CLASS ACTION COMPLAINT

Plaintiff Francis Pargett ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Wal-Mart Stores, Inc. ("Defendant" or "Walmart"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge:

## NATURE OF THE ACTION

1. This is a class action against Defendant Wal-Mart Stores, Inc. for misrepresenting the energy efficiency of Great Value-brand LED light bulbs, model numbers GVRLAO727D, GVRLAO727D4, GVRLAO750D, GVRLAO750D4, GVRLR1440D2, GVRLA6027ND, GVRLA60P, GVRLA60PAEP, GVRLA60PAEPO, GVRLA60PAM, GVRLA60PC, GVRLA60PDPL, GVRLA60PEPE, GVRLA60PJEA, GVRLA60POGE, GVRLA60PPNM, GVRLA60PPSO, GVRLA60PTP, GVRLA6050ND, GVRLA6050ND4, GVRLA6050ND2, GVRLA6050NDTCP, and GVRLA6027ND4 (collectively, the "Mislabeled LED Bulbs"), by promoting them as ENERGY STAR®-qualified and labeling them with the ENERGY STAR® logo. In fact, the Mislabeled LED Bulbs do ***not*** meet the ENERGY STAR® efficiency standards, and consume significantly more energy than their labels state.

2. ENERGY STAR®-qualified light bulbs are required by the U.S. Department of Energy ("DOE") to exceed minimum standards for energy efficiency. The Energy Star website explains that in the context of light bulbs, "[e]arning the ENERGY STAR certification means the product meets strict energy efficiency guidelines set by the US Environmental Protection Agency." More specifically, "[l]ighting products that have earned the ENERGY STAR label deliver exceptional features, while using less energy." The ENERGY STAR® informational website

1  further explains that "[s]aving energy helps you save money on utility bills and
2  protects the environment by reducing greenhouse gas emissions."[1]

3    3.    The ENERGY STAR® website reports that "ENERGY STAR Certified
4  Light Bulbs … [u]se about 70-90% less energy than traditional incandescent bulbs,
5  [l]ast at least 15 times longer and save[] about $55 in electricity costs over [the
6  bulb's] lifetime, [and] [m]eet strict quality and efficiency standards that are tested by
7  accredited labs and certified by a third party."[2]

8    4.    The same ENERGY STAR® website contains a publication entitled
9  *Lighting Made Easy: Brighten Our Planet's Future With ENERGY STAR®.*  This
10 publication explains that "ENERGY STAR means high quality and performance,"
11 and that "ENERGY STAR certified bulbs use less energy, so they cost less to
12 operate than standard bulbs."  The ENERGY STAR® website further explains that
13 "[s]aving money on your electricity bill is still simple: look for the ENERGY STAR
14 for energy savings."  That's because "[n]o matter the technology or the performance
15 claims, only bulbs with the ENERGY STAR label meet strict guidelines for
16 efficiency and performance that sets them apart."  The ENERGY STAR® website
17 specifically promises that "ENERGY STAR certified bulbs … [u]se up to 90% less
18 energy than standard bulbs, [s]ave about $80 in electricity costs over its lifetime,
19 [and] [p]rovide the same brightness (lumens) with less energy (watts)."[3]

20   5.    As a result, there is tremendous demand by consumers for ENERGY
21 STAR®-qualified products that bear the distinctive ENERGY STAR® mark.
22 According to the DOE's General Counsel, Scott Blake Harris, "[t]he ENERGY
23 STAR® label is a critical tool for consumers looking to save energy and money with
24 their appliances."  In fact, "[t]he ENERGY STAR mark ranks among the highest
25 level of influence on product purchase among all consumer emblems, similar in

---

[1] https://www.energystar.gov/products/lighting_fans/light_bulbs
[2] https://www.energystar.gov/products/lighting_fans/light_bulbs
[3] https://www.energystar.gov/products/ask-the-expert/lighting-made-easy

ranking to the Good Housekeeping Seal."  Moreover, a 2012 National Association of Home Builders ("NAHB") Home Trends & Buyer Preferences survey confirms that ENERGY STAR® products were the feature most desired by homebuyers, picked by 94% of respondents.

6.    ENERGY STAR®-qualified products are more expensive than standard models, but they come with the promise of reduced energy bills that, over time, will generate enough savings to recoup the higher price.  This is the fundamental bargain the ENERGY STAR® program offers: consumers pay a higher up-front purchase price but save more on energy bills ("Utility Bills") over time using the product.  For example, the ENERGY STAR® website explains that the "Total Cost" of "One 9-Watt LED ENERGY STAR Certified Light Bulb" is $18, while "Fifteen 43-Watt Standard Light Bulbs" delivering the same performance is $6.60 per bulb.  As such, the ENERGY STAR® bulbs command a 173% price premium over standard light bulbs.  However, given the greater efficiency of ENERGY STAR®, consumers can purportedly realize a "Total Savings" of $80 with an ENERGY STAR® device.[4]

7.    To capitalize on this demand, Walmart consistently and uniformly labeled and promoted its products, including the Mislabeled LED Bulbs, as ENERGY STAR®-qualified.  Walmart advertised and identified these models as ENERGY STAR® qualified products by prominently displaying the ENERGY STAR® logo on the Mislabeled LED Bulbs themselves.

8.    Walmart's promotion and sale of the Mislabeled LED Bulbs as ENERGY STAR®-qualified, when in fact they are not, is false and misleading, rendering the promised benefits of efficiency and Utility Bill savings illusory.  For Class members who purchased the Mislabeled LED Bulbs, the promised savings from reduced Utility Bills never came.  Instead, Class members were hit with a costly double-whammy:  a higher up-front price due to the substantial price premium

---

[4] https://www.energystar.gov/products/ask-the-expert/lighting-made-easy

that ENERGY STAR® LED bulbs command in the marketplace, followed by higher Utility Bills over the LED bulbs' useful life, since its actual energy consumption is substantially higher than what was promised. Each Class member paid a higher initial price for their LED bulbs and will pay higher Utility Bills every month – month after month and year after year – for as long as the LED bulbs remain in use.

9.     Plaintiff seeks relief in this action individually, and as a class action on behalf of similarly situated purchasers of the Mislabeled LED Bulbs, for (i) breach of express warranty; (ii) breach of the implied warranty of merchantability; (iii) unjust enrichment; (iv) fraud; (v) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (vi) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; and (vii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*

## THE PARTIES

10.     Plaintiff Francis Pargett is a citizen of California, residing in Rancho Cucamonga, California. In 2017, Plaintiff Pargett purchased Great Value-brand Mislabeled LED Bulbs, model GVRLA6027ND4, from a Walmart store in Rancho Cucamonga, California. He paid approximately $6.00 plus tax, which included a substantial price premium due to their supposed energy efficiency and ENERGY STAR® qualification. The units he purchased were marked with the ENERGY STAR® logo on the front of the packaging. He saw the ENERGY STAR® logo prior to and at the time of purchase, and understood it as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the products met the standards of energy efficiency established by the ENERGY STAR® program, and that the bulbs would help him maximize his energy savings while helping to protect the environment. He relied on these representations and warranties in deciding to purchase his LED bulbs,

and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the LED bulbs if he had known that they were not, in fact, ENERGY STAR® compliant.  He also understood that in making the sale, the retailer was acting with the knowledge and approval of the manufacturer and/or as the agent of the manufacturer.  He also understood that the purchase involved a direct transaction between himself and the manufacturer, because the bulbs came with packaging prepared by the manufacturer.

11.    Defendant Wal-Mart Stores, Inc. is a corporation organized under the laws of Delaware and maintains its principal place of business at 702 SW 8th Street, Bentonville, Arkansas 72716.  Walmart is a multinational retail corporation that runs chains of large discount department stores and warehouse stores.  Walmart has 11,593 stores in 28 countries, under 63 different names.  Walmart is the largest retailer in the world and is the world's third-largest public corporation.  Walmart owns the Great Value brand for certain in-store products, which now "spans more than 100 categories and is the country's largest food brand in both sales and volume."[5]  Defendant Walmart conducts substantial business throughout the United States, and specifically in the States of California and Arkansas.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and Plaintiff, as well as most members of the proposed Class, is a citizen of a state different from Defendant.

13.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claims

---

[5] https://corporate.walmart.com/newsroom/2009/03/15/walmarts-revamped-great-value-brand-delivers-affordable-quality-choices-when-consumers-need-them-most

herein occurred in this District.  Plaintiff Pargett is a citizen of California, resides in this District, and purchased his Mislabeled LED Bulbs from Defendant in this District.  Moreover, Defendant distributed, advertised, and sold the Mislabeled LED Bulbs, which are the subject of the present complaint, in this District.

## FACTS COMMON TO ALL CLAIMS

A.    **The ENERGY STAR® Promise And Its Significant Effect On Consumers**

14.    The Energy Policy and Conservation Act of 1975 ("EPCA"), 42 U.S.C. §§ 6291, *et seq.*, established an energy conservation program for major household appliances and products.  EPCA was amended by the National Energy Conservation Policy Act of 1978 ("NECPA"), Pub. L. 95-619, to, among other things, give the DOE authority to regulate the energy efficiency of several products.  Further amendments to EPCA in the National Appliance Energy Conservation Act of 1987 ("NAECA"), Pub. L. 100-12, established minimum energy efficiency standards for certain types of light bulbs.  In totality, the ECPA, NAECPA, and NAECA give the DOE authority to establish energy efficiency standards for light bulbs, "promote Energy Star compliant technologies," and "preserve the integrity of the Energy Star label."  42 U.S.C. § 6294a.

15.    ENERGY STAR® is a government-backed voluntary program, designed to "identify and promote energy-efficient products in order to reduce energy consumption, improve energy security, and reduce pollution through voluntary labeling of, or other forms of communication about, products and buildings that meet the highest energy conservation standards."  *See* 42 U.S.C. § 6294a.  The program is jointly administered by the DOE and the Environmental Protection Agency ("EPA").

16.     The ENERGY STAR® program is not a regulatory program;[6] rather, it consists of voluntary partnerships (with licensing agreements) between the DOE/EPA and industry participants that commit to manufacture products that meet the very highest standards of energy efficiency.  This licensing agreement, embodied in the standard partnership agreement ("Partnership Agreement") provides that both "parties concur that this agreement is wholly voluntary and may be terminated by either party at any time, and for any reason, with no penalty."  Furthermore, the Partnership Agreement states that the signatory or "partner will not construe, claim, or imply that its participation in the ENERGY STAR program constitutes federal government approval, acceptance, or endorsement of anything other than Partner's commitment to the program.  Partner understands its participation in the ENERGY STAR program does not constitute federal government endorsement of Partner or its buildings, homes, products, services, or industrial facilities."

17.     To qualify for the ENERGY STAR® program, LED light bulbs, including the Mislabeled LED Bulbs, must meet stringent energy efficiency criteria. The ENERGY STAR® website's "for consumers" page provided this same specification information to consumers.

18.     Since ENERGY STAR® is widely recognized as the preeminent brand for energy efficient products, participation in the ENERGY STAR® program has a significant impact on the marketability of products.

19.     The most significant tool used in the ENERGY STAR® program is the ENERGY STAR® label that incorporates the ENERGY STAR® certification mark. All appliances and products with the ENERGY STAR® label are required to meet the strict energy efficiency guidelines set by the EPA and the DOE.

---

[6] This is in stark contrast to the ECPA, which imposes ***mandatory*** minimum energy-efficiency standards on certain products.

20.    The message and promise conveyed by the ENERGY STAR® logo is that the appliance or product is ENERGY STAR®-qualified and thus complies with the strict energy efficiency level required by the ENERGY STAR® program. Because the product is ENERGY STAR® qualified, it will enable consumers to maximize their energy savings while helping to protect the environment.  The national retailers that dominate the appliance market rely extensively on ENERGY STAR®-related promotions, as well as the distinctive logo, to sell ENERGY STAR® devices and bring consumers to their stores.



21.    The campaign to promote ENERGY STAR® has continued for well over a decade.  To promote the message of energy efficiency and savings, the EPA launched a broad outreach campaign in 1997, encouraging consumers to look for the distinctive ENERGY STAR® label.  The campaign prominently mentioned the environmental benefits of the ENERGY STAR® program, but the focus was still on the financial savings that consumers could realize through superior energy efficiency.  According to the EPA, the first consumer campaign had three key messages:

> **ENERGY STAR saves you money and protects the environment.**  Use of qualified products in your home can mean up to 30 percent savings.
>
> **The second price tag.**  Products have two price tags: the purchase price plus the cost of electricity needed to use the product over its lifetime.

**An easy choice.** Either the product is energy efficient
because it displays the ENERGY STAR label, or it isn't.

22.    To facilitate the guiding principle of easily identifying efficient
appliances and products that offer savings on utility bills, the EPA set up specific
promotional and labeling guidelines for ENERGY STAR®-qualified products and
the use of its distinctive ENERGY STAR® mark as a label. Specifically, the
publication titled "Using the Energy Star Identity to Maintain and Build Value"
provides examples, guidelines and recommendations by the EPA "on how to get the
greatest value of the Certification Mark," *available at*
http://www.energystar.gov/ia/partners/logos/downloads/BrandBook508r.pdf. For
one, the mark "may never be associated with products … that do not qualify as
ENERGY STAR." *Id.* at 4.0.

23.    These marketing and educational efforts have culminated in one of the
most recognizable, global symbols for energy efficiency. Scott Blake Harris,
General Counsel for the DOE, has stated that "[t]he ENERGY STAR® label is a
critical tool for consumers looking to save energy and money with their appliances."

24.    In fact, the ENERGY STAR® label was *specifically engineered* to
convey a simple message to consumers: that a given product meets rigorous energy
efficiency standards. A product either meets ENERGY STAR® criteria, or it does
not. Maura Beard, a former director of strategic communication at the EPA for the
ENERGY STAR® Program, stated that:[7]

> The value of Energy Star for consumers is the fact that it's
> binary – that yes/no part of Energy Star, I think is a really
> important … attribute of the brand. So, when a consumer's
> picking a dishwasher, they're not looking at a sticker trying
> to decide, "Ok, this is a C on an ABCDEF … and trying to
> decide whether that's how that value of a C might relate to
> all the other attributes of, of the appliance… *[W]ith*

_____

[7] Pew Center on Global Climate Change Best Practices Conference, April 7, 2010
(emphasis added).

*Energy Star, it's a yes/no, it has it or it doesn't, and when it has it, it means one thing* … and I think that has tremendous value for the mainstream marketplace.

25.    For instance, in a January 2006 letter to the Federal Trade Commission ("FTC"), Whirlpool Corporation, a manufacturer of ENERGY STAR® products, wrote that "Whirlpool and the Association of Home Appliance Manufacturers (AHAM) conducted a consumer research study where a nationally representative sample of 1,000 respondents compared the current [ENERGYGUIDE] label with three alternatives…   The purpose of the study was to … determine which label design which, with an ENERGY STAR® logo added, *most clearly conveyed high efficiency of that appliance*.   The goal was to determine which label provided the consumer with the best information on the relative and absolute energy consumption of a particular model appliance.   It was equally important that the label <u>not</u> create the impression that it included information on anything other than energy consumption; that is, that it not imply anything about product quality, product performance or any other non-energy characteristic." (bold and italicized emphasis added, underline in original).

26.    The ENERGY STAR® label is more than a symbol.  It is "extremely successful as an informational device."  Declaration of Catherine Zoi, Assistant Secretary, Office of Energy Efficiency and Renewable Energy, *LG Electronics U.S.A., Inc. v. DOE, et al.*, No. 09-2297-JDB (D.C. Dec. 23, 2009), Dkt. No. 10-7, at ¶ 19.  It sends an unequivocal message to consumers:  the labeled product is ENERGY STAR® qualified – it meets the mandatory minimum efficiency standard required by the ENERGY STAR® program.

27.    The DOE and EPA have found that "[s]ubstantial portions of U.S. households in the surveyed population recognize, understand, and are influenced by the ENERGY STAR label."  This is supported by a prominent national survey

conducted in 2011, which found that 85% of households had at least a general understanding of the label's purpose, including 75% that had a "high understanding."

28.    That same survey found the ENERGY STAR® logo material, influencing the purchasing decisions of 88% of households that recognized it, including 76% whose purchase decisions were influenced "very much" or "somewhat."

29.    In September 2010, the EPA prepared a PowerPoint presentation entitled "Energy Star® Sales Associate Training."  The EPA's PowerPoint presentation emphasizes that the ENERGY STAR® logo helps consumers easily identify energy-efficient products and that "[t]he ENERGY STAR mark ranks among the highest level of influence on product purchase among all consumer emblems, similar in ranking to the *Good Housekeeping Seal*."  The PowerPoint presentation also included the following slide showing that the ENERGY STAR® label has an influence on 91% of consumers:



30.     Earlier this year, on the 20th anniversary of the ENERGY STAR®
program, the EPA issued a book entitled "Energy Star® Products – 20 Years of
Helping America Save Energy, Save Money and Protect the Environment."  In the
book, the EPA stated:

> Twenty years later, ENERGY STAR is a ***global symbol for
> energy efficiency***.  EPA recognizes ENERGY STAR
> products in more than 60 categories.  More than 80 percent
> of U.S. consumers recognize and understand the label,
> collectively buying an estimated 300 million ENERGY
> STAR qualified products every year. (emphasis added)

31.     In that same publication, Marc Hoffman, Executive Director of the
Consortium for Energy Efficiency ("CEE"), stated:

> When the federal government came up with the concept for
> ENERGY STAR and then extended it to appliances, CEE
> carefully deliberated before incorporating the brand into its
> own plans for advancing efficiency.  Over time the
> decision of CEE members to adopt ENERGY STAR as
> their marketing platform for energy efficiency has proven
> to be a great one.  Surveys show that ENERGY STAR is an
> important endorsement label for consumers and that it
> plays an equally important role as a marketing platform for
> myriad energy efficiency programs.
>
> ***
>
> EPA maintains a brand that simply and credibly identifies
> cost-effective-energy-saving opportunities that do not
> compromise amenity or reliability.  In turn, CEE members
> actively promote the ENERGY STAR in their energy-
> savings programs, thereby simplifying energy efficiency
> decision-making for their customers and helping to grow
> the brand.  ENERGY STAR also presents an excellent
> rallying point for energy efficiency organization and
> industry to work cooperatively.  We consider ENERGY
> STAR to be America's most trusted and recognized brand
> for energy efficiency.

32.     A 2012 NAHB Home Trends & Buyer Preferences survey[8] acknowledged that ENERGY STAR® products were the feature most desired by homebuyers, picked by 94% of respondents.

33.     There is no doubt that product manufacturers such as Walmart consider the ENERGY STAR® label to be a "promise" of "savings" and "energy efficiency."

34.     Participation in the ENERGY STAR® program has a significant impact on the marketability of products.  The message conveyed by the ENERGY STAR® logo is that the consumer can maximize his or her savings while helping to protect the environment.

35.     In fact, the ENERGY STAR® informational website represents that "ENERGY STAR Certified Light Bulbs" will "[u]se about 70-90% less energy than traditional incandescent bulbs" and "save[] about $55 in electricity costs over [the bulb's] lifetime," among other benefits:



Earning the ENERGY STAR certification means the product meets strict energy efficiency guidelines set by the US Environmental Protection Agency. Lighting products that have earned the ENERGY STAR label deliver exceptional features, while using less energy. Saving energy helps you save money on utility bills and protects the environment by reducing greenhouse gas emissions.

**ENERGY STAR Certified Light Bulbs:**

- Use about 70-90% less energy than traditional incandescent bulbs
- Last at least 15 times longer and saves about $55 in electricity costs over its lifetime
- Meet strict quality and efficiency standards that are tested by accredited labs and certified by a third party
- Produce about 70-90% less heat, so it's safer to operate and can cut energy costs associated with home cooling

Please see the ENERGY STAR light bulb saving calculator (EXCEL, 691 KB) to estimate your saving.

36.     The same ENERGY STAR® informational website further represents that "ENERGY STAR means high quality and performance," and that "bulbs with

---

[8] According to the NAHB, these results were obtained by surveys performed by NAHB and Better Homes and Gardens.

the label have been independently certified and [have] undergone extensive testing." As such, certified bulbs "[u]se up to 90% less energy than standard bulbs," "[s]ave about $80 in electricity costs over [the bulb's] lifetime," and "[p]rovide the same brightness (lumens) with less energy (watts):"



37.    The website further explains that ENERGY STAR® bulbs cost more than "standard light bulbs" (*i.e.,* a 172% price premium), but can provide "$80" of "Lifetime Savings" given the greater efficiency of ENERGY STAR® devices:



38.    In fact, the website says that the "Impact of ENERGY STAR" can make a real difference in consumers' electric usage.  The website notes that "lighting an average home can use more energy than your clothes washer, refrigerator, and dishwasher combined:"



39.    These representations are repeated on a publication entitled *LED Bulbs Made Easy: Just Look for the ENERGY STAR®* on the ENERGY STAR® website. The publication promises that "[o]nly LED bulbs that have earned the ENERGY STAR label have been independently certified and undergone extensive testing to assure that they will save energy and perform as promised."  The publication also reiterates that ENERGY STAR® bulbs are "[i]ndependently certified to deliver efficiency and performance," have the "[s]ame brightness (lumens) [while consuming] 70-90% less energy (watts)," and that choosing ENERGY STAR® bulbs will lead to "big $ savings:"



**B.    Walmart's Mislabeled LED Bulbs Were Uniformly And Prominently Marked With The ENERGY STAR® Logo On The Product Packaging**

40.    Walmart sought to capitalize on this tremendous demand for ENERGY STAR® products by consistently and uniformly labeling and promoting its products, including the Mislabeled LED Bulbs, as ENERGY STAR®-qualified.  Walmart advertised and identified these models as ENERGY STAR® qualified products by prominently displaying the ENERGY STAR® logo on the Mislabeled LED Bulbs themselves.

**C.    DOE Testing And Revocation Of The Mislabeled LED Bulbs' ENERGY STAR® Qualification**

41.    The success of the ENERGY STAR® program depends on the accuracy and reliability of the ENERGY STAR® logo as an indicator of highly efficient products.  To protect the integrity of the ENERGY STAR® label and certification mark, the DOE has evaluated and verified performance test results to ensure that ENERGY STAR®-certified appliances correspond to actual savings for consumers.

42.    On February 19, 2019, the DOE and/or EPA disqualified model GVRLR1440D2.

43.    On March 13, 2019, the DOE and/or EPA disqualified models GVRLAO727D, GVRLAO727D4, GVRLAO750D, and GVRLAO750D4.

44.    On June 18, 2019, the DOE and/or EPA disqualified models GVRLR1440D2, GVRLA6027ND, GVRLA60P, GVRLA60PAEP, GVRLA60PAEPO, GVRLA60PAM, GVRLA60PC, GVRLA60PDPL, GVRLA60PEPE, GVRLA60PJEA, GVRLA60POGE, GVRLA60PPNM, GVRLA60PPSO, GVRLA60PTP, GVRLA6050ND, GVRLA6050ND4, GVRLA6050ND2, GVRLA6050NDTCP, and GVRLA6027ND4.

45.    In accordance with guidelines and the EPA's disqualification procedures, these models were then posted on the EPA's list of disqualified models.

46.     Moreover, as a result of the disqualification by the EPA (after consulting with the DOE), Walmart was required to immediately cease labeling and shipping the products with the ENERGY STAR® logo, remove ENERGY STAR® references from related marketing materials, spec sheets, and websites, and cover or remove labels on units within the manufacturer's control.

47.     Walmart is the world's largest retailer, and it manufactures the Great Value LED bulbs at issue.  As such, Walmart either (a) tested the Mislabeled LED Bulbs before marketing them and, at all times relevant hereto, knew that the models were non-compliant with the requirements of the ENERGY STAR® program or, in the alternative (b) affixed ENERGY STAR® labels to the Mislabeled LED Bulbs without testing them, and thus knew the representation concerning their energy efficiency was baseless.  This information is solely within Walmart's possession.

48.     The Mislabeled LED Bulbs have never, at any point, been properly labeled with the ENERGY STAR® logo.  This is analogous to the unauthorized practice of medicine.  Suppose a fraudster misrepresents himself as a board-certified physician and opens a medical clinic, only to be exposed years later.  This does not mean that the fraudster was properly licensed to practice medicine prior to his exposure.  To the contrary, the fraudster was never licensed, and any statements to the contrary were false.  Here, Walmart made misrepresentations about the ENERGY STAR® status of the Mislabeled LED Bulbs.  Just because the DOE disqualified the units in 2019 does not mean they were compliant prior to 2019.  To the contrary, the DOE's determination means the Mislabeled LED Bulbs were *never* properly labeled.  Any representation to the contrary was false when it was made.  The Mislabeled LED Bulbs failed to work properly from the outset.

49.     The failure of the Mislabeled LED Bulbs to comply with ENERGY STAR® standards is a latent defect.  If this defect were known, the Mislabeled LED Bulbs would not have been saleable as described, and they would not measure up to

the description given to the purchaser.  Furthermore, this defect is hidden from purchasers.  Reasonable consumers do not have the knowledge or equipment to assess whether their bulbs are ENERGY STAR® compliant.  This information is solely within Walmart's possession.

50.    Plaintiff and Class members who purchased Mislabeled LED Bulbs paid a price premium due to their Mislabeled LED Bulbs' supposed superior energy efficiency and ENERGY STAR® qualification, and paid more money in additional energy costs to operate his or her Mislabeled LED Bulb than they would have had the bulbs actually met the ENERGY STAR® qualification as represented and promised by Walmart.  The additional Utility Bills can be reasonably quantified by an appropriate study, and through objective mathematical processes, based on the data from the DOE-initiated testing described herein.

51.    Plaintiff and the Class members could not have discovered that their LED bulbs were not ENERGY STAR® compliant until the EPA and/or DOE's disqualification orders were issued.  No reasonable consumer has the knowledge or equipment to test electrical products for ENERGY STAR® compliance.

52.    Plaintiff, and each purchaser of the Mislabeled LED Bulbs, paid a price premium due to their Mislabeled LED Bulb's energy efficiency and ENERGY STAR® qualification.  The amount of the price premium can be reasonably quantified by an appropriate market study of the prices for comparable LED bulbs sold with and without the ENERGY STAR® logo, or through a contingent valuation study, or through other means regularly employed by economic and valuation experts.

## CLASS ACTION ALLEGATIONS

53.    Plaintiff seeks to represent a class defined as all persons in the United States who purchased a Mislabeled LED Bulb (the "Class").

54.    Plaintiff also seeks to represent a subclass defined as all persons in California who purchased a Mislabeled LED Bulb (hereafter, the "California Subclass").

55.    Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Subclass number in the tens of thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but will be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Walmart and third party retailers and vendors.

56.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

(a)    whether the Mislabeled LED Bulbs were sold bearing false labels misrepresenting them as ENERGY STAR® compliant;

(b)    whether Class members suffered an ascertainable loss as a result of the Walmart's misrepresentations; and

(c)    whether, as a result of Walmart's misconduct as alleged herein, Plaintiff and Class members are entitled to restitution, injunctive, and/or monetary relief and, if so, the amount and nature of such relief.

57.    Plaintiff's claims are typical of the claims of Class members because Plaintiff and all Class members purchased a Mislabeled LED Bulb bearing a false label misrepresenting it as ENERGY STAR® compliant, when in fact it was not.

58.    Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained counsel competent and experienced in prosecuting class actions, and he

intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

59.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Walmart's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Walmart's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
**(Breach Of Express Warranty)**

60.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

61.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Walmart.

62.     Walmart, as the designer, manufacturer, marketer, distributor, or seller, expressly warranted that the Mislabeled LED Bulbs were fit for their intended purpose in that they would function properly as energy-efficient light bulbs within the parameters established by federal law and the ENERGY STAR® program.

63.     In fact, the Mislabeled LED Bulbs were not fit for such purposes because they do not function properly as energy-efficient light bulbs within the parameters established by federal law and the ENERGY STAR® program.

64.    Plaintiff and Class members were injured as a direct and proximate result of Walmart's breach because: (a) they would not have purchased the Mislabeled LED Bulbs on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the light bulbs as ENERGY STAR®-qualified; (c) the Mislabeled LED Bulbs did not perform as promised; and (d) Plaintiff and Class members have paid and will continue to pay higher Utility Bills as long as they continue to use the Mislabeled LED Bulbs.

## COUNT II
### (Breach Of The Implied Warranty Of Merchantability)

65.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

66.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Walmart.

67.    Walmart, as the designer, manufacturer, marketer, and/or seller, impliedly warranted that the Mislabeled LED Bulbs were fit for their intended purpose in that they would function properly as energy-efficient light bulbs within the parameters established by federal law and the ENERGY STAR® program.

68.    Walmart breached the warranty implied in the contract for the sale of the Mislabeled LED Bulbs in that the Mislabeled LED Bulbs could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose in that they did not function properly as energy-efficient light bulbs within the parameters established by federal law and the ENERGY STAR® program.  As a result, Plaintiff and Class members did not receive the goods as impliedly warranted by Walmart to be merchantable.

69.    Plaintiff and Class members are the intended beneficiaries of Walmart's implied warranties.

70.    In reliance upon Walmart's skill and judgment and the implied warranties of fitness for the purpose, Plaintiff and Class members purchased the Mislabeled LED Bulbs for use as energy-efficient light bulbs within the parameters established by federal law and the ENERGY STAR® program.

71.    The Mislabeled LED Bulbs were not altered by Plaintiff and Class members.  The Mislabeled LED Bulbs were defective when they left the exclusive control of Walmart.

72.    Walmart knew the Mislabeled LED Bulbs would be purchased and used without additional testing for energy efficiency by Plaintiff and Class members. The Mislabeled LED Bulbs were defectively designed and unfit for their intended purpose, and Plaintiff and Class members did not receive the goods as warranted.

73.    As a direct and proximate cause of Walmart's breach of the implied warranty, Plaintiff and Class members have been injured and harmed because: (a) they would not have purchased the Mislabeled LED Bulbs on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the light bulbs as ENERGY STAR®-qualified; (c) the Mislabeled LED Bulbs did not perform as promised; and (d) Plaintiff and Class members have paid and will continue to pay higher Utility Bills as long as they continue to use the Mislabeled LED Bulbs.

## COUNT III
### (Unjust Enrichment)

74.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

75.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Walmart.

76.    Plaintiff and Class members conferred a benefit on Walmart by purchasing the Mislabeled LED Bulbs.

77.     Walmart misrepresented that the Mislabeled LED Bulbs complied with ENERGY STAR® standards, and misrepresented the energy efficiency of the Mislabeled LED Bulbs, for the purpose of generating retail sales which could and did increase the amount of wholesale sales to Walmart.

78.     Walmart has been unjustly enriched in retaining the revenues derived from Plaintiff and Class members' purchases of the Mislabeled LED Bulbs. Retention under these circumstances is unjust and inequitable because Walmart misrepresented that the Mislabeled LED Bulbs complied with ENERGY STAR® standards, when in fact they did not, and misrepresented the energy efficiency of the Mislabeled LED Bulbs, which caused injuries to Plaintiff and Class members because: (a) they would not have purchased the Mislabeled LED Bulbs on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the light bulbs as ENERGY STAR®-qualified; (c) the Mislabeled LED Bulbs did not perform as promised; and (d) Plaintiff and Class members have paid and will continue to pay higher Utility Bills as long as they continue to use the Mislabeled LED Bulbs.

79.     Because Walmart's retention of the non-gratuitous benefit conferred on it by Plaintiff and Class members is unjust and inequitable, Walmart must pay restitution to Plaintiff and the Class members for their unjust enrichment, as ordered by the Court.

## COUNT IV
### (Fraud)

80.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

81.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Walmart.

82.     As discussed above, Walmart provided Plaintiff and Class and California Subclass members with materially false or misleading information about

the Mislabeled LED Bulbs.  Specifically, Defendant marketed the Mislabeled LED Bulbs as ENERGY STAR®, in that they would function properly as energy-efficient light bulbs within the parameters established by federal law and the ENERGY STAR® program.  As indicated above, however, these representations are false and misleading.

83.    The misrepresentations and omissions of material fact made by Walmart, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Mislabeled LED Bulbs.

84.    Walmart knew that the Mislabeled LED Bulbs did not function properly as energy-efficient light bulbs within the parameters established by federal law and the ENERGY STAR® program.

85.    The fraudulent actions of Walmart caused damage to Plaintiff and Class and California Subclass members, who are entitled to damages and other legal and equitable relief as a result.

86.    As a result of Walmart's willful and malicious conduct, punitive damages are warranted.

## COUNT V
### (Violation Of California's Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*) (Injunctive Relief Only)

87.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

88.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Walmart.

89.    CLRA § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status,

affiliation, or connection which he or she does not have."  Walmart violated this provision by representing the Mislabeled LED Bulbs as ENERGY STAR®-qualified and by misrepresenting the energy efficiency of the Mislabeled LED Bulbs.

90.    CLRA § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  Walmart violated this provision by representing the Mislabeled LED Bulbs as ENERGY STAR®-qualified and by misrepresenting the energy efficiency of the Mislabeled LED Bulbs.

91.    CLRA § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."   Walmart violated this provision by representing the Mislabeled LED Bulbs as ENERGY STAR®-qualified and by misrepresenting the energy efficiency of the Mislabeled LED Bulbs.

92.    At the time they made these representations and made sales to Plaintiff and California Subclass members, Walmart was aware of the defect because it was aware that DOE-initiated testing had shown the Mislabeled LED Bulbs did not comply with ENERGY STAR® standards.

93.    Plaintiff Pargett and the California Subclass members suffered injuries caused by Defendant's misrepresentations because: (a) they would not have purchased the Mislabeled LED Bulbs on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the light bulbs as ENERGY STAR®-qualified; (c) the Mislabeled LED Bulbs did not perform as promised; and (d) Plaintiff and Class members have paid and will continue to pay higher Utility Bills as long as they continue to use the Mislabeled LED Bulbs.

94.    Prior to the filing of this Complaint, a CLRA notice letter was served on Walmart which complies in all respects with California Civil Code § 1782(a). Plaintiff sent Walmart a letter *via* certified mail, return receipt requested, advising

Walmart that it is in violation of the CLRA and must correct, repair, replace or otherwise rectify the goods alleged to be in violation of § 1770.  Walmart was further advised that in the event that the relief requested has not been provided within thirty (30) days, Plaintiff would amend the Complaint to seek damages pursuant to the CLRA.  A true and correct copy of Plaintiff's CLRA letter is attached hereto as Exhibit A.

95.     Wherefore, Plaintiff and the California Subclass seek injunctive relief for violation of the CLRA.

### COUNT VI
### (Violation Of California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq.*)

96.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

97.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Walmart.

98.     Walmart is subject to the Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200 *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

99.     Walmart's conduct, described herein, violated the "unlawful" prong of the UCL by violating the EPCA, NECPA, NAECA, and regulations promulgated thereunder, governing the energy efficiency of light bulbs.

100.    Walmart's conduct, described herein, violated the "unfair" prong of the UCL by violating the policy or spirit of the EPCA, NECPA, NAECA, and regulations promulgated thereunder, governing the energy efficiency of light bulbs.

101.    Walmart's conduct, described herein, violated the "fraudulent" prong of the UCL by representing the Mislabeled LED Bulbs as ENERGY STAR®-qualified and by misrepresenting the energy efficiency of the Mislabeled LED Bulbs.

102.   Plaintiff and California Subclass members suffered lost money or property as a result of Walmart's UCL violations because: (a) they would not have purchased the Mislabeled LED Bulbs on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the light bulbs as ENERGY STAR®-qualified; (c) the Mislabeled LED Bulbs did not perform as promised; and (d) Plaintiff and Class members have paid and will continue to pay higher Utility Bills as long as they continue to use the Mislabeled LED Bulbs.

## COUNT VII
### (Violation Of California's False Advertising Law ("FAL"),
### Bus. & Prof. Code §§ 17500, *et seq.*)

103.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

104.   Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Walmart.

105.   California's False Advertising Law (*Bus. & Prof. Code* § 17500, *et seq.*) makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

106.   Walmart committed acts of false advertising, as defined by § 17500, by using false and misleading statements to promote the sale of Mislabeled LED Bulbs, as described above.

107.   Walmart knew or should have known, through the exercise of reasonable care that the statements were untrue and misleading.

108.  Walmart's actions in violation of § 17500 were false and misleading such that the general public is and was likely to be deceived.

109.  Plaintiff and California Subclass members suffered lost money or property as a result of Walmart's FAL violations because: (a) they would not have purchased the Mislabeled LED Bulbs on the same terms if the true facts concerning their energy efficiency had been known; (b) they paid a price premium due to the mislabeling of the light bulbs as ENERGY STAR®-qualified; (c) the Mislabeled LED Bulbs did not perform as promised; and (d) Plaintiff and Class members have paid and will continue to pay higher Utility Bills as long as they continue to use the Mislabeled LED Bulbs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

A.  For an order certifying the Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative of the Class and Subclass and Plaintiff's attorneys as Class Counsel;

B.  For an order declaring the Defendant's conduct violates the statutes referenced herein;

C.  For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

D.  For statutory, compensatory, and punitive damages in amounts to be determined by the Court and/or jury;

E.  For prejudgment interest on all amounts awarded;

F.  For an order of restitution and all other forms of equitable monetary relief;

G.  For injunctive relief as pleaded or as the Court may deem proper;

H.  For an order awarding Plaintiff and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit;

I.  Damages, restitution, and/or disgorgement in an amount to be determined at trial; and

1  J.    For such other and further relief as the Court may deem proper.

2  **JURY DEMAND**

3  Plaintiff demands a trial by jury on all causes of action and issues so triable.

4

5  Dated:  November 8, 2019                    **BURSOR & FISHER, P.A.**

6                                             By:  _/s/ Neal J. Deckant_____

7                                                      Neal J. Deckant

8                                             L. Timothy Fisher (State Bar No. 191626)
                                              Neal J. Deckant (State Bar No. 322946)
9                                             1990 North California Boulevard, Suite 940
                                              Walnut Creek, CA  94596
10                                            Telephone: (925) 300-4455
                                              Facsimile: (925) 407-2700
11                                            E-Mail: ltfisher@bursor.com
                                                      ndeckant@bursor.com
12
                                              **BURSOR & FISHER, P.A.**
13                                            Scott A. Bursor (State Bar No. 276006)
                                              Sarah N. Westcot (State Bar No. 264916)
14                                            2665 S. Bayshore Dr., Suite 220
                                              Miami, FL 33133-5402
15                                            Telephone: (305) 330-5512
                                              Facsimile: (305) 676-9006
16                                            E-Mail: scott@bursor.com
                                                      swestcot@bursor.com
17
                                              *Attorneys for Plaintiff*
18

19

20

21

22

23

24

25

26

27

28

## CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)

I, Neal J. Deckant, declare as follows:

1. I am counsel for Plaintiff, and I am a partner at Bursor & Fisher, P.A. I make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

2. The complaint filed in this action is filed in the proper place for trial because Defendant has purposefully availed itself of the laws and benefits of doing business in this State, and Plaintiff's claims arise out of the Defendant's forum-related activities in this District. Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this State and District, including Plaintiff's purchase of the Mislabeled LED Bulbs at issue in this matter. Plaintiff also resides in this District.

3. Plaintiff Pargett alleges that he purchased Great Value-brand Mislabeled LED Bulbs, model GVRLA6027ND4, for approximately $6.00 from a Walmart store in Rancho Cucamonga, California within the relevant time period. *See* Compl. ¶ 10. He saw the ENERGY STAR® logo prior to and at the time of purchase, and understood it as a representation and warranty by both the manufacturer (which created and affixed the labels) and the retailer (which displayed the labels) that the products met the standards of energy efficiency established by the ENERGY STAR® program, and that the bulbs would help him maximize his energy savings while helping to protect the environment. *See id.* He relied on these representations and warranties in deciding to purchase his LED bulbs, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the LED bulbs if he had known that they were not, in fact, ENERGY STAR® compliant. *See id.*

4. Plaintiff alleges that Defendant's misrepresentations played a substantial part, and was a substantial factor in his decision to purchase the Great Value brand LED Bulbs, "in that he would not have purchased the LED bulbs if he had known that they were not, in fact, ENERGY STAR® compliant." *See id.*

1    I declare under the penalty of perjury under the laws of the United States and the State of

2   California that the foregoing is true and correct, executed on November 7, 2019 at Walnut Creek,

3   California.

4

5                                                    */s/ Neal J. Deckant*
                                                      Neal J. Deckant
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

# BURSOR & FISHER

P.A.

1990 N. California Blvd.
SUITE 940
WALNUT CREEK, CA 94596
www.bursor.com

NEAL J. DECKANT
Tel: 925.300.4455
Fax: 925.407.2700
NDeckant@bursor.com

November 6, 2019

_**Via Certified Mail - Return Receipt Requested**_

Wal-Mart Stores, Inc.
702 SW 8th Street
Bentonville, Arkansas 72716

_Re:_      _Demand Letter Pursuant to California Civil Code § 1782_

To Whom It May Concern:

This letter serves as a notice and demand for corrective action on behalf of my client, Francis Pargett, and all other persons similarly situated, arising from violations of numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsections (a)(5), (7), and (9). This letter also serves as notice pursuant to Cal. Com. Code § 2607(3)(a) concerning the breaches of express and implied warranties described herein.

You have participated in the manufacture, marketing, and sale of Great Value-brand LED light bulbs, model numbers GVRLAO727D, GVRLAO727D4, GVRLAO750D, GVRLAO750D4, GVRLR1440D2, GVRLA6027ND, GVRLA60P, GVRLA60PAEP, GVRLA60PAEPO, GVRLA60PAM, GVRLA60PC, GVRLA60PDPL, GVRLA60PEPE, GVRLA60PJEA, GVRLA60POGE, GVRLA60PPNM, GVRLA60PPSO, GVRLA60PTP, GVRLA6050ND, GVRLA6050ND4, GVRLA6050ND2, GVRLA6050NDTCP, and GVRLA6027ND4 (collectively, the "Mislabeled LED Bulbs"). You promote the Mislabeled LED Bulbs as ENERGY STAR®-qualified and label them with the ENERGY STAR® logo. In fact, the Mislabeled LED Bulbs do _not_ meet the ENERGY STAR® efficiency standards, and consume significantly more energy than their labels state. Walmart's promotion and sale of the Mislabeled LED Bulbs as ENERGY STAR®-qualified, when in fact they are not, is false and misleading.

Mr. Pargett purchased the Mislabeled LED Bulbs, model GVRLA6027ND4, based on the claims that the bulbs met the ENERGY STAR® efficiency standards. He would not have purchased the bulbs if he had known that they were not, in fact, ENERGY STAR® compliant.

To cure the defects described above, we demand that you (1) cease and desist from continuing to mislabel the Mislabeled LED Bulbs; (2) issue an immediate recall on any

BURSOR&FISHER
P.A.

Mislabeled LED Bulbs bearing false and misleading labels; and (3) make full restitution to all purchasers of the Mislabeled LED Bulbs of all purchase money obtained from sales thereof.

We further demand that you preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1. All documents concerning tests of the energy efficiency of the Mislabeled LED Bulbs;

2. All communications with the U.S. Department of Energy concerning the Mislabeled LED Bulbs;

3. All documents concerning the advertisement, marketing, or sale of the Mislabeled LED Bulbs; and

4. All communications with customers concerning complaints or comments concerning the Mislabeled LED Bulbs.

We are willing to negotiate to attempt to resolve the demands asserted in this letter. If you wish to enter into such discussions, please contact me immediately. If I do not hear from you promptly, I will conclude that you are not interested in resolving this dispute short of litigation. If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents promptly.

Very truly yours,

Neal J. Deckant